The matter before the court today is whether Texas strict liability law can require the installation of an in-motion lock to a rear emergency exit door in a 2010 school bus taking into account the Federal Motor Vehicle Safety Standard 217 that outlines the minimum safety requirements for the operating forces of this exit door. There are two issues on appeal, Your Honor, and that's from the summary judgment regarding implied conflict preemption under Standard 217. First, Miranda's in-motion lock does not stand as an obstacle to purpose to provide a safe means of emergency evacuation, and second, the physical impossibility test is not satisfied to prohibit a greater level of safety for an in-motion lock to safeguard this exit door, as was held by this court in O'Hara v. GM in 2007. Here the in-motion lock design establishes a greater level of safety when the bus is passenger evacuation. The facts here are undisputed that a safe emergency evacuation occurs only after the bus comes to rest. Even Navistar's engineering expert, Thomas Livernoy, in his deposition on the record at 1256-1257 and 1262-1263 states this. At the time of the incident, Your Honor, the bus was traveling on the highway, a 13-year old middle schooler, Gabriel Miranda, Jr., opened the rear emergency exit door just with the unlatching and exited the back of the bus to his death. But the problem here is the bus had not experienced a crash. The bus had no emergency, yet the door was able to be released and opened when it was unsafe to exit and unlatched and opened by a force of only .8 pounds when the standard provides for a maximum of a 40-pound force, which is 178 newtons to open this door. Also undisputed is this lock is designed as a separate device from the manual release mechanism. This lock only locks the door, only engages when the bus is moving above a real-time freeway speed or 30 miles an hour. It unlocks below the threshold and it unlocks in its default position, including when the bus is at rest but the wheels are spinning, when there's a malfunction in the device where it cannot sense the real-time speed, or when power is lost to the device or to the bus. Again, why doesn't the reg at S5.3.2, the first sentence seems to say that the emergency exit shall allow manual release, that is opening of the door of the exit by a single occupant. And then it goes on to say that the, that it, excuse me, let me find out what I was looking for. I think that's right, manual release. Yeah, but then, means that the release mechanism cannot be activated remotely. So, one of the contemplate that there's no, there should be no impediment to opening the rear exit except for that manual release. But it says it should, you should not be able to open the door with a remote device that would be subject to failure. It, you know, any mechanical device can fail. Right. Your Honor, the situation here is it's clear in the language that the legislature separated a release mechanism, which is the latch, from a locking mechanism, which is our, our in-motion lock. And specifically in… Does your argument turn on that? Because I, the district court seemed pretty persuasive to me. The focus here is just on the door. Does it open or not? Do you have to convince us that there's a distinction between release mechanism and latch? Yes, your Honor. I mean, it's clearly, if the door is open, okay, you have, the first level is the latch. Is the latch, is the latch on or is the latch off? You unlatch it or is it in the, in the latch position? Then our second level is the lock, okay? So it doesn't interfere with the manual latch at all. But it does prevent manual release by a single occupant, regardless of remote connections. I thought Berriman's testimony about taxis in London and things like that, that those are remote systems or they're driver operated, one or the other, right? His safer system? Yes, your Honor. But, okay. So it seems like that's in conflict with the language. It's, the language here specifically, your Honor, states that, and I'll specify to you in Section 5.3.1 reads, when the release mechanism is not in the position that causes the emergency exit door to be closed and the vehicle's ignition is in the on position, a continuous warning sound shall be audible. So what this means here is that the release mechanism is not just opening the door. It's a whole separate device as a component of the door. And so the language shows that the release mechanism can function independently from a lock. And so we're saying the statute is silent as to a lock with the exception of when the ignition system turns on, the starting system turns on. That's the only time the door cannot be locked. And that's by the statutory language here. And so it also shows in this particular language that the door should not be open when there is not an emergency evacuation. So it doesn't want this door to be open at any time as Navistar wants it to be and as the trial court says it should be. But, I mean, you recall the Estrada decision, which is roughly contemporaneous with the 92 reports in this case, correct? The Estrada? Yes. Yes. There the consensus of experts were that the door's got to be open, able to open while the bus is in motion. That's reasonable and necessary. And I thought that was the tragic choice that NHTSA made, which is some of these buses crash and they're upside down so the system would register that it's still driving over three miles an hour and yet children would be in. The problem with Estrada is distinguishable from this case. In that case, the expert did say that it needed, the door needed to be able to be opened at any time. In this case, Your Honor, it's distinguishable because we have experts that say in the record at 1256 and 1257, 1262 and 1263, Mr. Livenoy says, and I quote, exiting a bus while it's moving faster than zero is dangerous. He agrees. I'm just going to interrupt only because your time's close. But that may be what experts say, but if a different decision was made so that a bus that goes off a cliff and its wheels are still spinning, I thought NHTSA thought about this and they wrote this single occupant has always got to be able to exit even while in motion because we can't rely on, even the vandal lock systems weren't working. Right? Your Honor, the locking system that we propose would be unlocked in the default position by the time it's rolling down a cliff or into a lake or whatever. Wouldn't that be a basis for new rulemaking? No, Your Honor. It would not be. Here, the statutory language and the experts here say that the emergency exit door should not be open any time the bus is moving. Where does the statute, where does the FSA say that? In the statute, it only says here that the bus in section . . . I mean, I thought that was the expert, but I thought that was the opposite of what they said. No, Your Honor. It says when tested under the condition S6, and S6 is the vehicle is on a flat horizontal surface, this limits the condition to the time the bus is at rest for manual release of the door. And so it says here specifically in section 5.3.3.1, quote, when tested under the condition of S6, and S6 is the vehicle is on a flat horizontal surface, and we understand when it's on a flat horizontal surface, it's not moving at all. Well, you read that into it, but the reg doesn't say that it's parked. I mean, you can be moving it on a flat surface. We've asked in the deposition if this was a regulation compliance test, and Navistar confirmed that it was, and the experts say it is never tested when the vehicle is in motion. And so it's a compliance test that they have certified to NHTSA that they've done this, and all the tests show that the bus is sitting still at rest on a horizontal flat surface. Well, that doesn't mean, though, that it shouldn't be true when it's moving. But, Your Honor, there are no words, you know, that it should be moving. But no words saying it should be parked either. Well, if there are no words that it should be moving, I think we should look into the situation where NHTSA's final rule in 1992 emphasizes its intent for a safe emergency evacuation. And here in this case, it says in the summary section at 49.413, this rule is intended to facilitate the exiting of occupants from a bus after an accident and thus improving the likelihood of their survival. There is no situation where we have school children exiting a bus when it's moving. There's no situation. Common sense says the bus has to be at rest before there is this egress. But what do you do with the language in sentence two of that same section where it says the release mechanism, we're talking about the manual release mechanism, shall operate without the use of remote controls or tools and notwithstanding any failure of the vehicle's power system. So, I mean, you say it would always be off, but it seems to me the reg is suggesting that we don't know that this mechanical or electronic device or whatever remote system is going to work right so it will deactivate. Your Honor, the situation here is that there have been patents already since 1972 for this type of device. There have been vehicles in Europe that have this device. And here, even our passenger vehicles have this, can have this device. The technology is there. Could your brief describe any place that school buses have the device? I know it's taxis in London and it's elsewhere. No, Your Honor. So isn't that what's going on in 92? They're saying school buses, terrible accidents occur, systems malfunction. It's upside down, wheels are running. It's over a cliff. There's a fire. We've decided more lives will be saved if it's the most simple mechanical system operable by a person. No connection to a speed lock. But that's a latch, and that's at the time. So it is the latch lock. It is the latch. It is the release mechanism. It is not the lock mechanism, Your Honors. In this situation, there is readily accessible emergency egress because the lock is in the default off unlock mode when the engine is started, so it doesn't violate the statute, when the bus is moving across the ground in less than 30 miles an hour, so there's plenty of time for the door to be able to be opened, and then when the power is lost and when it malfunctions. So all of those, in those situations where there's a malfunction or a power loss, Mr. Berryman's design accommodates this. And so if you do not give credibility to the moving party's evidence, as is the proper standard of review for summary judgment, then all of those catastrophic malfunctioning situations are accounted for by Mr. Berryman's design, and it only locks above 30 miles per hour and below 30 miles per hour during the time that a fact finder could say that the door is easily, without hesitation, readily accessible for emergency evacuation, that's a fact issue, Your Honor, that the trial court should have allowed and not allowed the summary judgment. The other situation is the trial court went beyond the clear, unambiguous language of Standard 217 to adopt and give credibility and weight to Navistar's generalizations. Here, Miranda's in-motion lock would provide a lot of time before the passing. Ms. Winn, your red light has come on, but you do have rebuttal argument. Thank you. Thank you. Mr. Sheehy. Yes, Your Honors. Good morning. Good morning. May it please the Court, I am sure I speak on behalf of the lawyers, to thank the Court for accommodating us on the rescheduling of this argument in light of our difficulties getting here the night before last, so thank you very much. Travis Armstrong and I are here on behalf of the Navistar defendants. I think counsel stated the issue before the Court properly, and this is a preemption case, and we know that the alternate design, and I use that term loosely because it hasn't been designed, it hasn't been proven, it hasn't been tested, and the more complex we make a design, the more powerful it is. Well, their facts are that it has been designed and it's being used all over in 2021, right? I thought it— Your Honor, the thought of an automatic lock, yes, but the ideas about having it fail in the off position, the use of GPS, and all of those things that this expert supposedly has come up with, he hasn't designed it. We know that there are—their ability to make automatic locks, but significantly, and I think the Court was heading in this direction, the plaintiffs have not challenged the rule or the safety standard. They have not claimed it's arbitrary or capricious. They have not asked— Right. Aren't they saying—this is—I sort of first principles. Congress did delegate to create the rules, but they created a savings clause. So if states are free, even through their tort regimes, to add safety, right? Yes, sir. Okay. That's correct. So if now by 2021 it's a disputed issue of fact that you could have something that adds safety, there isn't—it's a failsafe arrangement. I know you would dispute that, but it's a disputed issue of fact. It might be negligent not to implement something that's being used worldwide because no one is going to need to jump when they're going 65 miles an hour. No one should jump when it's 30 miles an hour or 25 miles an hour. Right. And I think Berryman says three miles an hour is what the system allows. But the issue, because there is no challenge to the regulation, the issue is not whether the regulation is wise or it's valid or it's more or less safe. The only question in this case is whether this alternate design conflicts with the regulations as they exist. Correct. And the regulations as they exist do not allow for an automatic lock, do not allow— But they don't—the regs don't say anything about even while in motion, and they don't try to say we can discern when there's an accident and when there isn't. So what's—where you're going is going to help me. What's the language in the regulation that conflicts with a system that would keep it locked at a highway speed? The exit door shall allow manual release of the door by a single person within both inside and outside the bus. Yeah. The release to open the door must operate without the use of remote controls or tools. One of these— That's the language, right? One of these designs talks about the use of GPS, and if Hyperspace isn't a remote place, I don't know what is. So you're saying their expert, Berryman, every design he proposed was one that had driver control or remote control. That conflicts with that language. Yes, it has to be, and they admit it. And it's the—and that the release must operate even with the failure of the bus's electrical system, and it is operating based on the electrical system of the bus. But the vandal locks, they're required or allowed, and yet they fail because they're connected to the key ignition, aren't they? They are in the same—well, let's step back. The vandal lock, of course, serves an entirely different situation. True, but it—sometimes it's on even though the bus is moving. No, because the vandal lock, there's a warning that sounds whenever the warning lock is locked and the bus is operating. I read it as saying that after the bus is starting, the vandal—the warning does not come on. The warning comes on so that it's got to be disengaged before you can start the engine. That part is true. You do have to disengage it before you can start the engine. But there'd be nothing to prevent you from locking it then after you're going down the road. But I think the opinion of the court and the record is that there's a continuous warning when the vandal lock is engaged. I guess the only reason I brought it up is that shows the system accepts remote connections that actually— But the connection is not remote. The connection is manual. It's just a simple bolt. I know, but I thought the 92 report described how a lot of buses start driving away, and it's locked because the vandal lock connection system doesn't work. We may be talking over each other, but the vandal lock is a simple bolt. It's a manual operation. Their proposed design locks it remotely electronically. There's nothing manual about it. You start the bus. It goes up to 30 miles an hour, and boom, the lock hits, and nobody can unlock it unless it goes down below 30 miles an hour. Your argument is textual conflict, but are you also saying that NHTSA actually contemplated this tragic choice and made a choice? Yes, and this goes to the second aspect or the second prong of the preemption analysis, which what is the purpose of the objective of NHTSA for want of a better term. Now plaintiffs proposed to you, and stay flatly in their brief, that safety is served by locking children in a bus so they can't jump out. That is the plaintiff's view. NHTSA has the opposite view, which is safety is served by allowing easy and quick exit from the bus in the event of an emergency. Now there are obviously some gives and takes because do we want children jumping out of buses? Of course not. Would we like to prevent that from happening? Of course we would. But NHTSA made a choice, and NHTSA decided based on the horrific accidents that Your Honors are familiar with that took place before 1992 that it is better that what we need to do is to make sure that these children can get out of the bus. And so we have decided as a matter of policy that the doors remain open even while the bus is in operation, understanding that no one is going to be thrown out of the bus unless they try to get out of it intentionally. Well, they're not open, you've got to… Right, exactly right, Your Honor. They're not going to be because they can't, because it's latched. It's a mechanical latch. And so NHTSA has decided, and specifically in the regulation, and plaintiffs try to draw a distinction between a latch and a lock. I don't understand that at all. It makes absolutely no sense. According to them, the lock goes on at 30 miles an hour, everybody is locked in the bus, and then suddenly an emergency arises, a child goes up and tries to move the handle, and she moves the handle up and down, but it does no good because she can't get out. There cannot be a distinction between the operation of the latch and the opening of the door because there's no other purpose for that latching mechanism. I read, obviously, the record and read Berriman, and I guess it did seem like what he's basically saying is what exists in planes. You always worry someone's going to try to open the door, but you can't until it touches the ground. So I guess they're saying it's an easy design. It's every single plane. You can't until the wheels are below three miles an hour. Again, is this design feasible? Maybe, in terms of all the bells and whistles. But we do know that the more complex the design, the more possibility that it's going to fail. Is this one called the Navistar design? Is that sort of an industry term? I don't – I have not seen that term, Your Honor. This design – and there is no dispute in this case that Navistar has complied completely with the safety standards. Okay, but in the record in this case, is there any other bus design in the United States? Is there anything in this record? This is what the buses have to do. I mean all of them have got this because it's a federal regulation. They all have to have this. In fact, in the Estrada case, it was Cardinal, Champion, another bus company that had that design. But it's mandated for everybody, and there is no bus manufacturer in the United States, or I think anywhere, who has used some automatic locking system because the use of an automatic locking system means that a manual release is not possible. We cannot manually release a door if it's been automatically locked. We can't unlock the door if there are – In Estrada, the earlier kids, when it was stationary, had gone out, and then it just didn't shut. I'm sorry. In Estrada, the facts were two kids go out when it's open, when the bus has stopped, and then it starts, and the third one falls out. That's right. And again, the point being, yes, apparently they were misbehaving, and two of them jump out, and then Yolanda decides she's going to jump out too, and they're leaving a stop sign, as I recall, and it was a slow speed. Of course, that's another problem that we have. At what speed is it acceptable to lock this door? The problem is that the evidence is it's unsafe at almost any speed to jump out. So if we're going to take plaintiff's theory to its logical conclusion, we would have to automatically lock the door at a very low rate of speed. And doesn't that, then, go completely fly in the face of what NHTSA is trying to do in terms of keeping these doors open? Actually, that point brings me to another. They did preserve a tort claim relating to defective warning, and the district court said, well, the regs require concision. But why can't a state require that you just have a warning saying, danger, don't open while moving? I guess maybe a state could, but there is no warnings. Let me step back. I'd have to think that through a little bit, but the trial court, Judge Crane said that Navistar met all the requirements and that it was preempted as a matter of warning, and plaintiffs have not challenged the warnings in this court. Oh, that's not before us? Oh, okay. That's not before you. Okay. I thought they were. Because they never raised it before this court. Their whole claim now is designed. Okay. And that is this automatic locking system. And again, what we have is we've got both prongs of the analysis. One is, is there a conflict? Could Navistar have put in this automatic, electronic, remotely controlled lock consistent with the regulations? Okay. They couldn't do it for the reasons we talked about. It doesn't allow a manual release by a single person. It has to operate with the use of remote controls, which is, again, something the regulation says you can't do. And also, if there's a failure of the power system and we hear about how, oh, it's going to default into an open position, what's to say that the default mechanism becomes problematic? The point is, is that NHTSA, the second prong, what is the objective of NHTSA? NHTSA made it clear that, on balance, we are concerned about children being trapped in these buses. And so, through these regulations, and there is language in the final rule about how we want the doors to be able to be opened while the bus is in operation easily. Is it a good idea to open them while the bus is moving? Probably not. But, again, we have some protection against that in terms of the locking mechanism. But the wisdom of the regulation is not an issue. Does the automatic, electronic, remotely controlled locking system violate the safety standards that NHTSA has set out? The answer is clearly yes. Either one creates a preemption problem. I'm not as convinced either argument creates a preemption problem. Correct. I'm not following necessarily that 30 years ago they wanted to freeze out a savings clause possibility if you could truly come up with something that would guarantee safety, never interfere after accident. True, except the savings clause, I mean, let's face it, every standard is a minimum because no one can go below it without violating the standards. But let's encourage states to go above it, right? Certainly. But we cannot conflict with the regulation. We cannot add or subtract something that violates it. And does this violate it? The answer is yes. Would NHTSA approve this automatic system? My guess is no, but that's not the point. The point is that it hasn't and that plaintiffs have not challenged the rule. Okay. So we have to deal with it as it is. And again, this idea about some difference between latching and releases, there is no purpose to this release other than to open the door. Otherwise, it wouldn't be there. So to say that somehow the regulations apply to this. I was startled Estrada hasn't been cited ever until this case. I was startled that the Estrada decision has never been cited. Until this case. Yeah. Yeah. So no court, no circuit has faced this school bus conflict preemption argument? Did you know? I don't. And I, before I came here today for third Tuesday, when Southwest hadn't for nine and a half hours, but I checked to see if there were any other cases involving the school bus design and I did not see any. And of course, Navistar's position is there's a reason for that. It's because it was clear what the regulations say. And Your Honor, I understand it. I understand that we can disagree about whether there should be a change or shouldn't be a change, but Your Honor hit the nail on the head. If we're going to do that, that's through rulemaking. Or the challenge in the trial court, the validity or the wisdom of these regulations. On several fronts, this automatic locking the system, conflicts with the regulation, and then the second prong being the objectives of NHTSA. NHTSA decided for good reason, but for whatever reason, that it is better to have the bus able to be opened, that doors should be locked on school buses while they are in operation. Okay. I think we've got your answer. So Judge Crane did a thorough job in analysis of the regulations. His summary judgment was proper. I'm going to ask you to affirm his judgment. Thank you. Thank you, Counsel. Your Honor, before I leave, I was handed a sheet right before the second argument. The plaintiff's prepared and apparently they have submitted it to the court. There are local rules relating, to my knowledge, demonstrative exhibits, but they're supposed to be served to the court earlier, so opposing counsel has them. But I think I only have peeked at it, Counsel. I think it's actually just the verbatim rules with highlighting. But certainly if on further analysis you see that there's annotation that's beyond that text, you'd have leave to move to strike if it's not properly submitted. I think that's fine. We've been around, we've been in this court a long time, and to get it right before the second argument this morning is just a problem. The local rules exist. I think I'm correct that she should have submitted it earlier. Rebuttal time. Does that contain anything other than the verbatim language of the regulations? No, Your Honor. So the annotations you did are the highlighting. Yes. And that, of course, should have been submitted early so opposing counsel would see it. We submitted it to them before we submitted it to the court. I apologize. This is what we— All this morning. All this morning. Why don't you go ahead. Your time's running. Your Honor, when opposing counsel stated that NHTSA in 1990 stated that the door remained open while in operation, so therefore the bus should be moving and be allowed the door to be opened, NHTSA in 1990 didn't have the 1992 final rule that states here, and it added four extra words in here on the definition of locked. Locked means that the release mechanism cannot be activated and the exit opened. In 1976, it did not have these extra four words. And so that's why in 1990 it was not clarified that the release mechanism is separate from the lock. And here NHTSA in 1992 also said it did not want to hinder school bus safety improvements in the future at 49.418, and on the same page it said it would like to provide for the safe, organized, and efficient egress of passengers. And so we all know that, and common sense tells us, that nobody is going to be having kids jump out of a bus when it's going at highway speeds or freeway speeds. And for this analysis, the United States Supreme Court states in 2007 in the National Association of Home Builders, it is a fundamental canon of statutory construction that words of a statute must be read in their context and with a view in their place in the overall statutory scheme. So, Your Honors, as much as Navistar would like for us to infer more into this, we can only look at the statute for its plain language, and here it is very clear that Standard 217 separates a locking mechanism from a release mechanism, a latch from a lock, an unlatched door from a locked door, and Berryman's design is fail-safe in that it unlocks if there is an incident or a malfunction. And for a summary judgment analysis, there can be no credibility or weight of the evidence to the contrary. But the latch-lock distinction still means the kids can't get out if the latch electronically doesn't allow it. The problem here is the latch is not electronic. It is still manual. Okay, I'm sorry, the lock, the locking mechanism. Whichever one it is that Berryman wants to control, so you envision these horrible scenes where a bus gets hit by another car, and it's on fire, but it's still rolling. The system would have to actually really then be only at a highway speed, not at a 20-mile-an-hour speed. If it's low at a 20-mile-an-hour speed, it's default unlocked. It's off. It's unlocked. And that latch can be released. Those are complex systems. Those are more complex than the planes. Yeah, they're unlocked if it works. Right? A plane unlocks when it hits the ground. I think what… It's like a sensor, Your Honor. We've had sensors, like rollover sensors. Everybody thinks it's very complicated, but if a wheel lifts up, it predicts that there's a catastrophe. So then it's trying to break and everything. So technology has well improved since the 70s for these decades. We can do a lot of things now, and I know that there are issues with the self-driving cars, but we are getting there, and so technology is there. And NHTSA for sure says that it believes that it wanted to minimize the post-crash injuries and deaths on buses, and they wanted it to be able to do that in a safe and improved way in the future. It predicted this in 1992. We have the technology now, Your Honor. It's not more complicated. It's one switch. If you look in Berryman's report, he says it's a simple switch that has a patent since 1972. There is no complication in this. It's just a sensor, a real-time speed sensor, and a switch. If the electricity goes out, it falls into default unlock mode. So it's back to its original position with just the latch on the door, and that's it. So this is not as complicated as… But it is a remote control device. Your Honor, and that is for the lock, not for the latch, not for the release mechanism. I understand your argument. Thank you. Thank you, Counsel. That concludes the cases for this sitting. We stand in recess.